Michael G. ALBRECHT, Appellant–
Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49S00–9901–CR–55.

Supreme Court of Indiana.

Oct. 19, 2000.

Katherine A. Cornelius, Marion County Public Defenders Office, Appellate Division, Indianapolis, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Kathryn Janeway, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

RUCKER, Justice

A jury convicted Michael Albrecht for the 1992 murder of his wife Cynthia for which he was sentenced to sixty years imprisonment. In this direct appeal, Albrecht raises six issues for our review which we rephrase and reorder as follows: (1) did the State fail to preserve and provide the defense with exculpatory evidence; (2) did the trial court improperly exclude evidence related to Albrecht's defense; (3) did the trial court improperly admit evidence offered by the State; (4) was Albrecht tried by a fair and impartial jury; (5) did the trial court err in its instructions to the jury; and (6) was the evidence sufficient to support the conviction? We affirm.

**Facts and Procedural History**

Cynthia and Michael Albrecht worked for different owners participating in the Championship Auto Racing Teams (CART) series. During the 1992 CART season the Albrechts began experiencing marital difficulties. As a result, Cynthia moved out of the marital home and thereafter filed for divorce. On October 26, 1992, one day before the divorce was scheduled to become final, Cynthia returned home from the final CART race of the season. She had made plans to meet a male friend in Florida later that week. However, after making a telephone call at approximately 9:30 p.m., Cynthia disappeared. Her naked and decapitated body was discovered several weeks later in a field in Northern Indiana.

On June 4, 1997, after a five-year criminal investigation, the State charged Albrecht with Cynthia's murder. One of the State's key witnesses at trial was William Filter, a long-time friend of Michael Albrecht. He had initially provided Albrecht with an alibi for the evening Cynthia disappeared. However, Filter later changed his story and told police that Albrecht had planned to murder Cynthia after their marriage soured. The plan included decapitating Cynthia to make identification of her body difficult. A jury convicted Albrecht of murder, and the trial court sentenced him to sixty years in prison. Albrecht filed a motion to correct error raising many of the issues he presents to us on appeal. The trial court denied the motion. This appeal followed. Additional facts are set forth below where relevant.

**Discussion**

**I.**

In his motion to correct error Albrecht sought a new trial complaining that the State failed to preserve and provide him with the interview notes of an FBI agent. According to Albrecht, the State's action denied him due process of law and the right to a fair trial. The essential facts are these. The FBI assisted Speedway police in investigating Cynthia's death. Working out of Milwaukee, Wisconsin, agent Daniel Craft interviewed several friends and relatives of Albrecht. In this appeal, Albrecht's claim focuses on the notes taken during Craft's two interviews of Albrecht's wife of a previous marriage. During the interviews, Craft made handwritten notes and thereafter reduced the notes to a summary report. In response to Albrecht's discovery request for notes, notations or any memoranda of oral statements, the State provided the summary reports. However, the State did not provide Albrecht with the handwritten interview notes. The record shows that Craft

placed the notes in the FBI's Milwaukee case file, which was supposed to be forwarded to the Indianapolis office. Apparently, the FBI failed to forward the notes to Indianapolis, and in 1995, three years after the interviews took place, the notes were destroyed according to normal FBI procedure. At trial the State called Craft as a rebuttal witness. During his testimony, Craft referred to a portion of his interview with Albrecht's former wife that was not mentioned in his summary report. Specifically, Craft testified that Albrecht's former wife, Kathleen, told him that she was a light sleeper and would do anything to get Albrecht back.[1] Albrecht contends the now missing interview notes would have impeached Craft's trial testimony by demonstrating that Craft was mistaken about his recollection of the interview.

Adopting the United States Supreme Court's decision in *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), this Court has declared that the scope of the State's duty to preserve exculpatory evidence is:

> limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Holder v. State*, 571 N.E.2d 1250, 1255 (Ind.1991) (quoting *Trombetta*, 467 U.S. at 488–89, 104 S.Ct. 2528 (footnote and citation omitted)). The notes at issue here do not meet the standard of constitutional materiality as Albrecht has not shown that the handwritten interview notes played a significant role in his defense. More specifically he has not demonstrated that the notes possessed an exculpatory value. *Holder*, 571 N.E.2d at 1255. Exculpatory is defined as '[c]learing or tending to clear from alleged fault or guilt; excusing.' *Samek v. State*, 688 N.E.2d 1286, 1288 (Ind. Ct.App.1997) (quoting BLACK'S LAW DICTIONARY 566 (6th ed.1990)). Even assuming the notes could have in some way impeached Craft's trial testimony, such impeachment would have hardly risen to the level of clearing Albrecht of Cynthia's murder. Furthermore, Albrecht provides no basis for us to conclude that Craft's notes would have shown whether Kathleen actually made the statements or that Craft's recollection of the interview was incorrect. Craft testified that the summary reports, which did not mention the statements, were a reliable and complete account of the interview. Albrecht used the reports to impeach Craft's recollection of the interviews. Thus, he accomplished the task for which he now claims the notes were necessary.

■ At most, the notes may have been potentially helpful to Albrecht's case as additional evidence. However, the State's failure to preserve useful evidence violates the Fourteenth Amendment only when the defendant can show bad faith on the State's part. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *Vermillion v. State*, 719 N.E.2d 1201, 1206 (Ind.1999), *reh'g. denied*;[2] *see*

---

1. Craft's report and testimony at trial indicated that during the first interview, Kathleen stated that she was barely awake when Albrecht returned to her home early Monday morning at approximately 2:00 a.m. after spending the evening with Filter, and that Albrecht let himself in with a key. Kathleen, however, testified at trial that she was awakened at 2:00 a.m. by Albrecht knocking on her door because his key would not work, and that she had to get out of bed and let him inside. In Craft's report, Kathleen was unsure of the time Albrecht returned, but at trial she was certain it was 2:00 a.m. Also, Craft testified that Kathleen told him she still loved Albrecht and would do anything to get him back. His report stated that Kathleen desired to get back with [Albrecht].... R. at 4300.

2. Albrecht cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in support of his claim. Although closely related to the principles of evidence preservation announced in *Trombetta* and *Youngblood*, *Brady* is not directly on point. *Brady* applies in situations where a defendant discovers after

also *Killian v. United States*, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961) (declaring that where the pre-trial destruction of an FBI agent's notes, which were transferred to other documents that were made available to the defense, was done in good faith as part of a normal practice, their destruction would not be impermissible nor deprive a defendant of any right). Here, Albrecht has made no showing of bad faith. He was not denied due process of law nor the right to a fair trial.

## II.

Albrecht asserts the trial court improperly excluded evidence related to his defense, namely: the results of a witness's polygraph examination, evidence that a witness worked as a confidential informant, and the deposition testimony of an absent witness.

### A. The polygraph examination

Matthew Kernal had dated Cynthia on at least one occasion and was initially identified by police as a possible suspect in her death. At the request of police, Kernal took a polygraph exam, and some of his responses showed signs of deception. Albrecht attempted to get the results before the jury, but the trial court ruled they were not admissible.

■■■■ As a general proposition a trial court is given wide discretion in determining the admissibility of evidence. However, it has no discretion to admit evidence of a polygraph examination absent a waiver or stipulation entered into by both parties. *Wright v. State*, 593 N.E.2d 1192, 1194–95 (Ind.1992). Here, the State did not agree to the admission of Kernal's polygraph results. Therefore, the trial court properly excluded the evidence. Further, Al-

brecht's claim that the State's failure to consent to admission of the results denied him a fair trial is unavailing. The State is not required to stipulate to the admission of polygraph results. *Hestand v. State*, 491 N.E.2d 976, 979 (Ind.1986). We find no error here.

### B. Evidence that Kernal worked as a confidential informant

■■ Speedway Police led the investigation into Cynthia's murder. Albrecht argues that evidence should have been admitted to show that police did not thoroughly investigate Kernal because of their association with him as a confidential informant. The essential facts are these. During the course of trial, defense counsel received a telephone call from a man claiming Kernal worked with Speedway Police as a confidential informant in a case involving the caller. One of Albrecht's main defense strategies was to call into question the department's diligence in thoroughly investigating the murder and other potential suspects, including Kernal. Albrecht questioned Kernal outside the presence of the jury about his alleged work as an informant. Kernal denied knowing the caller or working as an informant. Instead, he stated that he once helped a friend who worked as an informant by riding around with him and identifying potential drug dealers. Kernal also did not recall working with Speedway Police and said that he never received favorable treatment from police for helping his friend. After hearing Kernal's testimony, the trial court precluded Albrecht from presenting evidence on the topic, stating

trial that the prosecution suppressed material,exculpatory information. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Brady has no application ... where the alleged exculpatory evidence no longer exists but its content was nonetheless revealed through testimony at trial. *Noojin v. State*, 730 N.E.2d 672, 676 n. 1 (Ind.2000) (citing *Williams v. State*, 714

N.E.2d 644, 649 (Ind.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000)). The notes in this case were negligently destroyed well before trial and testimony as to their existence and content was presented during trial. Further, there was no evidence of suppression by the State. Therefore, *Brady* is inapplicable here.

that it found no evidence to link the information to this case. We agree.

Only relevant evidence is admissible, and relevant evidence is any evidence 'having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' *Jester v. State*, 724 N.E.2d 235, 240 (Ind.2000) (quoting Ind. Evidence Rule 401). Albrecht failed to show the relevance of his proffered evidence regarding Kernal. Kernal denied working as an informant and more specifically, working with Speedway Police. Albrecht did not attempt to have the caller testify or present any other evidence on the issue. Thus, although Kernal testified that he had once assisted his friend, Albrecht offered no evidence that Kernal actually worked as an informant or received favorable treatment from Speedway Police. Albrecht presented no evidence linking Kernal's aid of the informant with this case. The trial court did not abuse its discretion.

### C. The deposition testimony of an absent witness

Jerry Dillehay is an acquaintance of Kernal and apparently was unavailable to testify at trial.[3] During pre-trial discovery, Albrecht took Dillehay's deposition in which Dillehay discussed specific instances of misconduct on the part of Kernal as well as Kernal's reputation for violence. The trial court found evidence of specific acts of misconduct on the part of Kernal to be inadmissible under the Indiana Evidence Rules. Also, the trial court excluded evidence of Kernal's reputation for violence in part because Dillehay admitted he had a limited knowledge of Kernal and thus he had an insufficient basis to form an opinion regarding Kernal's reputation.

■ When Albrecht offered the deposition at trial, he provided no argument for its admissibility, stating Can we just enter the transcript as the record, Your Honor? ... Because Dillehay's not here so there's no proffer we can really do. R. at 4172–73. Furthermore, Albrecht even anticipated that the court would exclude the deposition. Before the court ruled he stated, I don't think [the judge] is going to let any of it in. R. at 4151. Albrecht has similarly failed to present us with a cogent argument demonstrating that the trial court's ruling was incorrect. Instead of challenging the trial court's basis for excluding the evidence, he simply argues the evidence was relevant to show that Kernal had acted violently toward his girlfriends in the past, and therefore he likely killed Cynthia. Albrecht's failure to present us with a cogent argument supporting his allegation of trial court error results in waiver of the issue. *See Marshall v. State*, 621 N.E.2d 308, 318 (Ind.1993).

■ Waiver notwithstanding, the trial court's decision to exclude the deposition was correct. The record supports the conclusion that Albrecht was attempting to use evidence of Kernal's character solely for the forbidden purpose of showing action in conformity therewith. *See* Ind. Evidence Rule 404(a) (Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion ....); *see also* Evid. R. 608 (providing that evidence of a witness's character may be attacked by opinion evidence only in regards to the witness's character for truthfulness and may not be shown by extrinsic evidence of specific acts of misconduct not reduced to a conviction). There was no error here. The trial court did not improperly exclude evidence related to Albrecht's defense.

### III.

Albrecht challenges as error the trial court's admission into evidence of his

---

3. Neither party has addressed, at trial or on appeal, whether Albrecht met the unavailability requirements of Indiana Evidence Rule 804 or Indiana Trial Rule 32 regarding the admission of Dillehay's deposition. Therefore, we will not address the issue in this opinion.

statements to police, a tape-recorded telephone conversation between Albrecht and another person, and an autopsy photograph of his wife's decapitated body. He complains the statements were not voluntarily given, the telephone conversation violated his right to counsel, and the prejudicial impact of the photograph outweighed its probative value.

### A. Albrecht's statements to police

Albrecht gave two statements to an officer of the Speedway Police Department. The first occurred at the Speedway Police Station on October 28, 1992. Albrecht claims this statement was inadmissible at trial because the examining officers failed to give him *Miranda* warnings. The State counters that no such warnings were necessary because Albrecht was not in custody at the time. We agree with the State.

Rights under *Miranda* apply only to custodial interrogation. *Cliver v. State*, 666 N.E.2d 59, 66 (Ind.1996). To determine whether a defendant is in custody we apply an objective test asking whether a reasonable person under the same circumstances would believe themselves to be 'under arrest or not free to resist the entreaties of the police.' *Torres v. State*, 673 N.E.2d 472, 474 (Ind.1996) (quoting *Jones v. State*, 655 N.E.2d 49, 55 (Ind.1995)). As we declared in *Loving v. State*, 647 N.E.2d 1123, 1125 (Ind.1995), [t]he test is how a reasonable person in the suspect's shoes would understand the situation.

The record shows the first interview was held only two days after Cynthia was reported missing. In response to a request by investigating officer William Jones, Albrecht went to the Speedway police station to speak with the officer. At that point, police were investigating a report of a missing person and sought background information concerning Cynthia in the hope of determining her whereabouts. Officer Jones testified at a motion to suppress hearing that he specifically advised Albrecht that he was not under arrest and was free to leave at any time. Albrecht counters that Officer Jones believed that he was a suspect in Cynthia's disappearance but did not so advise him. This fact is not dispositive. The question is whether a reasonable person in Albrecht's situation would believe himself to be under arrest or not free to resist the entreaties of Officer Jones. Under the facts presented here we conclude no reasonable person could reach such a conclusion. The trial court properly admitted the statement into evidence.

The second interview took place in November 1992 while Albrecht was in Fort Lauderdale, Florida, visiting a relative. Officer Jones flew to Florida and accompanied Albrecht to a Fort Lauderdale police station. At the motion to suppress hearing, Officer Jones testified that although he again advised Albrecht that he was not under arrest and was free to leave, he nonetheless read Albrecht his *Miranda* rights before questioning began. The record does not reveal that Albrecht was presented with or signed a waiver of rights. However, Albrecht did give an audio-taped statement and according to officer Jones, Albrecht never indicated that he did not wish to speak with the officer.

In this appeal, Albrecht acknowledges that he was advised of his *Miranda* rights. He complains however that Jones knew [Albrecht] had an attorney as early as the 27th or 28th of October. Jones at no point contacted [Albrecht's] attorney to tell him [Albrecht] would be interviewed. Brief of Appellant at 40. We first note that this assertion is not only misleading, but also misplaced. The record shows that at the time of the interview Albrecht was represented by counsel in a divorce proceeding and apparently Officer Jones was aware of that fact. Albrecht does not explain why the officer would contact Albrecht's divorce lawyer concerning a criminal matter. More importantly, as part of the *Miranda* warnings, Officer Jones advised Albrecht that he had a right to counsel and the right to remain silent. Albrecht stated that he understood his rights

and proceeded to answer Officer Jones's questions. The record shows that Albrecht never asserted his right to counsel which requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney. *Goodner v. State,* 714 N.E.2d 638, 641 (Ind.1999) (quoting *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)). By speaking to the officer, Albrecht waived his rights. *Carter v. State,* 730 N.E.2d 155, 157 (Ind.2000) (An express written or oral waiver of rights is not necessary to establish a waiver of *Miranda* rights.). Other than now complaining that counsel was not present at the second interview, Albrecht makes no other assertion exploring why his waiver was involuntary. We find no error on this issue. The trial court properly allowed this statement into evidence as well.

### B. Recorded telephone conversation

Anthony Ferrari was a racing-industry friend and acquaintance of Albrecht and Cynthia. Ferrari spoke to police about statements Albrecht had made regarding Cynthia and Albrecht's desire to harm her. At the request of police, Ferrari called Albrecht, who was living in Florida at the time, and recorded their conversation. That conversation, which was admitted at trial over Albrecht's objection, recounted many of Albrecht's prior discussions with Ferrari.

 Albrecht contends that recording his conversation with Ferrari violated his right to counsel as articulated by the United States Supreme Court in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Albrecht's reliance on *Massiah* is misplaced. In that case, the defendant had been indicted and was on bail when federal authorities surreptitiously listened to a pre-arranged, non-custodial conversation between the defendant and the accomplice. The Court held that the defendant's Sixth Amendment right to counsel was violated when

authorities deliberately elicited comments from him after he had been indicted and in the absence of counsel. *Id.* at 206, 84 S.Ct. 1199. Thus, when authorities in *Massiah* solicited incriminating comments from the defendant via the accomplice, judicial proceedings had been initiated against him. That is not the case here. A defendant's Sixth Amendment right to counsel applies only to critical stages of the proceedings at or after the time that adversary judicial proceedings have been initiated against the defendant. *Dullen v. State,* 721 N.E.2d 241, 242 (Ind.1999), *cert. denied,* —— U.S. ——, 121 S.Ct. 118, 148 L.Ed.2d 73 (2000). Here, Albrecht's recorded conversation with Ferrari took place on December 4, 1992, well before adversarial proceedings were initiated against Albrecht. As such, his Sixth Amendment right to counsel was not violated. Furthermore, Albrecht's rights under *Miranda* were not implicated because he was clearly not in custody when the call was recorded. *See Dye v. State,* 717 N.E.2d 5, 14 (Ind.1999) (*Miranda* warnings are required only in the context of custodial interrogation.), *reh'g. denied, cert. pending.* The trial court did not err in admitting the statement into evidence.

### C. Autopsy photograph

Over Albrecht's objection, the trial court admitted an autopsy photograph of Cynthia, depicting her neck and shoulder region where her head had been severed. Albrecht argues the photograph lacked probative value because Cynthia's head was severed after she was killed.

 We review the trial court's decision to admit photographic evidence for an abuse of discretion. *Cutter v. State,* 725 N.E.2d 401, 406 (Ind.2000), *reh'g. denied.* Although a photograph may arouse the passions of the jurors, it is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice. *Id.* (quoting Evid. R. 403). A photograph has probative value and is generally admissible if it demonstrates or illustrates

a witness's testimony. *Wallace v. State*, 725 N.E.2d 837, 839 (Ind.2000); *Elliott v. State*, 630 N.E.2d 202, 204 (Ind.1994).

 Here, the photograph was admitted during the testimony of the forensic pathologist who examined Cynthia's body. Her body had not been altered by the pathologist, and the photograph essentially depicted Cynthia's body as it was found. Photographs showing the victim in his or her natural state following death are generally relevant and admissible. *Woods v. State*, 677 N.E.2d 499, 504 (Ind.1997). Before the photograph was admitted into evidence, the pathologist stated that it would help him explain his testimony. He then testified that based in part upon his examination of the neck area, the cause of death was likely traumatic injury of the neck. We have held that photographs of a victim's corpse in a homicide case are relevant to serve as an aid to understanding the pathologist's findings on the cause of death. *Id.* The fact that the pathologist could not state for certain what caused Cynthia's death does not render the photograph inadmissible. Furthermore, the pathologist also described saw marks discovered in the bone around the wound and the uniform and regular pattern of the cuts in the skin and muscle, indicating that a sharp object was used to sever Cynthia's head. The photograph was probative because it allowed the jury to see the wound and to place the pathologist's testimony in context.

 Moreover, the evidence of decapitation was relevant to link Albrecht to Cynthia's murder because Albrecht had stated his intention to kill Cynthia and remove her head so she could not be identified through dental records. *See Schmidt v. State*, 255 Ind. 443, 455, 265 N.E.2d 219, 225 (1970) (finding photographs of victim's dismembered body were properly admitted to substantiate evidence that murder was carried out according to a plan to kill and dismember body). Although the photograph is certainly grue-some and likely stirred the emotions of the jurors, its probative value was not substantially outweighed by the danger of unfair prejudice to Albrecht. The trial court did not err in admitting the photograph into evidence.

## IV.

Albrecht contends he was denied a fair trial because two jurors, Marvin and Yolanda Smith, were brother and sister. Apparently the parties did not learn of their relationship until after Albrecht's trial. During voir dire, neither Albrecht, the State, nor the trial court asked any of the potential jurors if they were related to each other. Albrecht argues that the jurors' brother-sister relationship prejudiced his right to be tried by twelve independent and impartial jurors. Brief of Appellant at 44. He also contends that Marvin and Yolanda were obligated to disclose their relationship during voir dire even though no questions regarding familial relationships were raised by the parties or the trial court.

 Albrecht was certainly entitled to a fair and impartial jury, and proof that a juror was biased against the defendant or lied on voir dire may entitle the defendant to a new trial. *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind.1988). That is not the case here. Yolanda testified at the hearing on Albrecht's motion to correct error that she believed the parties knew she was related to Marvin because the summonses to appear for jury duty were delivered to the same address on the same day. She further stated, Had that [the fact she was the sister of another potential juror] come up, had the question been raised, I certainly would, would have given the flag, but he [her brother] has his opinion, I have my opinion, we were given instructions not to talk about the case. We did not do that ever. So I didn't see how it was relevant or that we did anything improper. R. at 4521. We agree

with Yolanda's assessment.[4] Absent an inquiry during voir dire, she and her brother were not required to inform the parties of their relationship.

■■■■ Furthermore, Albrecht wholly fails to demonstrate that the jurors' relationship prejudiced his right to a fair trial. At the hearing on Albrecht's motion to correct error, both jurors testified that they did not discuss the case while the trial was taking place, and Albrecht has cited nothing to show that these jurors were anything but fair and impartial. A defendant is entitled to a new trial only upon a showing of bias or serious misconduct upon the part of the juror which resulted in harm to the defendant. *Lopez,* 527 N.E.2d at 1130; *Allread v. State,* 582 N.E.2d 899, 902 (Ind.Ct.App.1991). In this case, Albrecht has made no such showing.

### V.

■■■■ Albrecht next complains the trial court erred in denying three of his tendered instructions. The instructions covered: (1) circumstantial evidence; (2) the State's burden of proof at trial; and (3) the conduct of the jury during deliberations. In reviewing the trial court's refusal to provide disputed instructions, we consider whether the instruction correctly states the law; whether there is evidence in the record to support the giving of the instruction; and whether the substance of the tendered instruction is covered by other instructions. *Emerson v. State,* 724 N.E.2d 605, 608 (Ind.2000). Although Albrecht claims otherwise, our review of the record shows that the substance of each of his tendered instructions was covered by the trial court's own instructions. On this ground alone the trial court correctly refused to give Albrecht's tendered instructions.

■■■■ Albrecht also challenges the trial court's decision to give its own instruction on reasonable doubt in addition to an instruction that Albrecht tendered. The record shows the trial court gave an instruction approved by a majority of this Court in *Winegeart v. State,* 665 N.E.2d 893, 902 (Ind.1996). Reasoning that the two complemented each other, the trial court also gave the following instruction tendered by Albrecht:

> A reasonable doubt is a fair, actual and logical doubt that arises in your mind after an impartial consideration of all the evidence and circumstances in the case. It should be a doubt based upon reason and common sense and not a doubt based upon imagination or speculation.
>
> To prove the defendant's guilt of the elements of the crime charged beyond a reasonable doubt, the evidence must be such that it should convince you of the truth of it, to such a degree of certainty that you would feel safe to act upon such conviction, without hesitation, in a matter of the highest concern and importance to you.[5]

R. at 491, 544.

Albrecht makes two claims: (1) the *Winegeart* instruction represents an incorrect statement of the law on reasonable doubt; and (2) giving both instructions confused the jury because the firmly con-

---

4. In addition, as the trial court noted in denying Albrecht's motion to correct error, Yolanda and Marvin both filled out Albrecht's lengthy, detailed jury questionnaire, which was slightly modified by the trial court. Although the questionnaire did not include an inquiry regarding relationships between jurors, according to the trial court Yolanda and Marvin provided several significant common answers. R. at 709. However, Albrecht did not question them about their common answers, e.g., same last name, recent death of grandmother, common place of worship, and soon-to-be brother-in-law and fiancé was a correctional officer.

5. Albrecht's tendered instruction was criticized, but not found to be constitutionally inadequate, by a majority of this Court in *Winegeart,* 665 N.E.2d at 898. Two members of our Court found the criticized instruction to be an appropriate description of reasonable doubt. *Id.* at 904–05 (DeBruler, J., concurring in result, joined by Shepard, C.J.).

vinced language in the *Winegeart* instruction is inconsistent with the degree of certainty to act without hesitation language in his own instruction. Therefore, according to Albrecht, the trial court should have given only one instruction, his own.

As to the first claim, we have approved of the *Winegeart* instruction on numerous occasions and decline Albrecht's invitation to revisit the issue here. *See McGregor v. State*, 725 N.E.2d 840, 842 (Ind.2000); *Turnley v. State*, 725 N.E.2d 87, 89 (Ind. 2000); *Williams v. State*, 724 N.E.2d 1093, 1094–95 (Ind.2000); *Dobbins v. State*, 721 N.E.2d 867, 874–75 (Ind.1999); *Ford v. State*, 718 N.E.2d 1104, 1105 (Ind.1999); *Barber v. State*, 715 N.E.2d 848, 851–52 (Ind.1999); *Williams v. State*, 714 N.E.2d 644, 650 (Ind.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1195, 145 L.Ed.2d 1099 (2000); *Young v. State*, 696 N.E.2d 386, 390 (Ind.1998); *Tobias v. State*, 666 N.E.2d 68, 69 (Ind.1996). We therefore reject Albrecht's claim that the instruction represents an incorrect statement of the law.

As for Albrecht's second claim, we do not agree that giving both instructions tended to confuse the jury as to the State's burden of proof. The Due Process Clause of the Fourteenth Amendment protects an accused 'against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' *Winegeart*, 665 N.E.2d at 896 (quoting *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). The test for determining the constitutionality of a reasonable doubt instruction is whether 'there is a reasonable likelihood' that the jury applied the instructions to convict based upon constitutionally insufficient proof of guilt. *Id.* at 897–98 (quoting *Victor v. Nebraska*, 511 U.S. 1, 6, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994)). Simply because the language of the instructions differs, it does not necessarily follow that the definitions are inconsistent or conflicting. Although we maintain our belief that the first instruction is the better of the two and requires no supplement to fully inform the jury about the concept of reasonable doubt, *id.* at 902, Albrecht has not convinced us that providing supplementation in the form of the second instruction tended to confuse or mislead the jury. As we observed in *Winegeart*, [w]hile the federal constitution requires that juries be instructed 'on the necessity that the defendant's guilt be proven beyond a reasonable doubt,' it does not require the use of 'any particular form of words.' *Id.* at 896 (quoting *Victor*, 511 U.S. at 5, 114 S.Ct. 1239). Rather, the instructions taken as a whole must correctly express the concept of reasonable doubt to the jury. *Id.* (quoting *Victor*, 511 U.S. at 5, 114 S.Ct. 1239). Viewing the court's instructions as a whole, we conclude that there is not a reasonable likelihood that the jurors applied the instructions to convict Albrecht based upon constitutionally insufficient proof of guilt. The trial court did not abuse its discretion in instructing the jury on reasonable doubt.

## VI.

Last, we address Albrecht's contention that the evidence was insufficient to support his conviction. In reviewing a sufficiency of the evidence claim, we do not reweigh the evidence or assess the credibility of the witnesses. *Brown v. State*, 720 N.E.2d 1157, 1158 (Ind.1999). Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*

Albrecht argues that the evidence was not sufficient to convict him because the testimony of William Filter, the State's key witness, was inconsistent, incredible, uncorroborated, and coerced by threat of prosecution and incarceration by the State. His claim amounts to an invocation of the incredible dubiosity rule. *See*

*Tillman v. State*, 642 N.E.2d 221, 223 (Ind. 1994); *Gaddis v. State*, 253 Ind. 73, 80–81, 251 N.E.2d 658, 661–62 (1969). Under this rule, a court will impinge on the jury's responsibility to judge witness credibility only when confronted with inherently improbable testimony or coerced, equivocal, wholly uncorroborated testimony of incredible dubiosity. *Tillman*, 642 N.E.2d at 223. Application of this rule is limited to cases, such as *Gaddis*, where a sole witness presents inherently contradictory testimony which is equivocal or the result of coercion and there is a complete lack of circumstantial evidence of the appellant's guilt. *Id.* In such an action, an appellate court may reverse the judgment of the trial court. *Id.*

In support of his contention, Albrecht cites a series of events that he claims led to a dramatic change in Filter's account of the events surrounding Cynthia's death. Filter and Albrecht had been friends for approximately twenty years. R. at 2718. On several occasions during the lengthy criminal investigation into Cynthia's murder, Filter provided an alibi for Albrecht, telling police that he was with Albrecht on the night Cynthia disappeared. R. at 2747, 2766–69, 2774–76, 2784–85. However, when police contacted Filter again in August 1997, they told him that they did not believe his story and informed Filter that he could be charged with assisting a criminal and face jail time. R. at 2788–89. Police also told Filter that he could be arrested and jailed until resolution of the case if he could not afford bail, which could amount to $100,000. R. at 2757–58, 2788–91. Filter contacted an attorney, who arranged a meeting with police. R. at 2759. Before the meeting, police provided Filter and his attorney with a copy of the probable cause affidavit it had generated against Albrecht. R. at 2793, 2806–08. When confronted with this information and the threat of prosecution and possible jail time, Filter told police that his previous statements were untrue and that he had been covering for Albrecht, who killed Cynthia. R. at 2743, 2799, 2809–10. Filter recounted this story at trial wherein he described in detail his communications and contact with Albrecht regarding Albrecht's desire to kill Cynthia and ultimately Albrecht's confession to Filter that he had in fact killed her.[6] R. at 2727–2750. Both his statement to police and trial testimony were given under a grant of use immunity by the State. R. at 2715, 2717, 2764, 2800, 2833–34.

Albrecht argues Filter's testimony at trial was coerced by threat of prosecution and imprisonment by police and therefore was unworthy of credit and insufficient to sustain the conviction. In further support of his claim, Albrecht also contends that Filter's testimony was unreliable because he changed his story only after reading the probable cause affidavit given to him by police and subsequently provided police only with information found in that document. The thrust of this portion of Albrecht's claim is that police gave Filter the information for which they needed corroboration and he simply told them what they wanted to hear to avoid punishment.

Although Albrecht raises legitimate issues regarding Filter's credibility, these issues were fully presented to the jury at trial. Albrecht extensively cross-examined Filter about the change in his story and the forces that Albrecht believed played a factor in Filter ultimately implicating Albrecht in Cynthia's death—the threat of prosecution and jail time. R. at 2766–

---

6. At trial, Filter testified that Albrecht had initially asked him to kill Cynthia, and when he declined Albrecht said he would do it himself and that his first wife Kathleen, who lived in Milwaukee, would provide an alibi. R. at 2728, 2734–37, 2741. Filter stated that he agreed to be an additional alibi witness for Albrecht. R. at 2737–39, 2741, 2746–47, 2755. Filter also testified that Albrecht had confided in him the plan to murder Cynthia, telling him that Cynthia's head would have to be severed so her body would not be easily identified through dental records. R. at 2731–2744, 2811–12. Filter told the jury that Albrecht confessed to following through with his plan to kill Cynthia. R. at 2743.

2801. The jury was also made aware that although Filter faced charges for assisting a criminal, he was testifying under a grant of use immunity and would receive a sentence recommendation from the State if prosecuted and convicted. R. at 2715, 2717, 2764, 2800, 2833–34. Albrecht also pointed out that many of the details in Filter's story could be found in the probable cause affidavit. R. at 2806–19. Therefore, Albrecht's contention that Filter only changed his story to avoid imprisonment and his assertion that Filter's testimony was unworthy of credit were placed squarely before the jury for consideration. Nevertheless, in carrying out its role as the trier of fact, the jury apparently found Filter's testimony to be worthy of credit. *See Ellis v. State,* 725 N.E.2d 411, 412 (Ind.2000) ( [I]t is within the jury's province to assess the credibility of all witnesses and weigh the evidence . . . . ). The extent to which threats may have, in some degree, affected a third party's testimony goes to the weight to be given the testimony by the trier of fact. *See Barnes v. State,* 269 Ind. 76, 84, 378 N.E.2d 839, 844 (1978); *Cain v. State,* 594 N.E.2d 835, 840 (Ind.Ct.App.1992), *reh'g. granted on other grounds; McIntyre v. State,* 460 N.E.2d 162, 166 (Ind.Ct.App.1984).

■ We cannot say that the jury's credibility assessment in this case was, as a matter of law, improper. In response to Albrecht's attacks at trial, Filter held firm in his assertion that he was testifying truthfully. R. at 2763–64, 2810, 2848–49, 2871–72. Filter also explained the impact of the affidavit on his statement and testimony. He told the jury that he finally changed his story and told the truth when, after briefly examining the affidavit, he realized that other information had surfaced that supported what Albrecht had been telling him regarding Cynthia's murder. R. at 2848–49. He appeared to believe facts were beginning to surface about Cynthia's murder and decided to come clean. *Id.* In sum, Filter's testimony was not incredibly dubious. It was therefore up to the jury to evaluate Filter's testimony and assess his credibility in light of the circumstances presented by Albrecht. We will not substitute our judgment for the jury's as to Filter's credibility.

■ Further, the jury need not have relied solely on Filter's statement to convict Albrecht. In addition to Filter's testimony, other evidence tended to support the jury's conclusion that Albrecht murdered Cynthia. Albrecht's former employer, Antonio Ferrari, testified that Albrecht contacted him about trying to hire someone to do something permanent to Cynthia and that the person could be paid from the $50,000 in life insurance proceeds. R. at 2625–2631, 3039. A life insurance policy for Cynthia did in fact exist, naming Albrecht as the beneficiary. R. at 3081, 3117–20. Albrecht continued to make payments on the policy after he and his wife separated, and he filed a claim for the benefits approximately six months after Cynthia's body was discovered. R. at 3049, 3081, 3143–49. He ultimately received $52,000 from the policy. R. at 3111. When Ferrari informed Albrecht that he would be unable to help him, Albrecht told Ferrari that he would do it himself. R. at 2629. Albrecht also contacted his brother in Florida expressing his anger toward Cynthia and attempted to hire someone to rough up Cynthia. R. at 2480–82. *See Shane v. State,* 716 N.E.2d 391, 398 (Ind. 1999) (finding the defendant's expression of animosity toward the victim and discussions about killing the victim supported murder conviction despite other erroneously admitted evidence). Further, Albrecht made somewhat frequent trips to Milwaukee, Wisconsin, and was in Milwaukee during a part of the weekend Cynthia disappeared. R. at 2743, 3758, 3774, 3803, 3860, 3864. Cynthia's body was found in a field in Northern Indiana near I–65, Albrecht's route between Indianapolis and Milwaukee. R. at 2130, 2133, 2677. Although this evidence standing alone may not have been adequate to convict Albrecht, when considered together and with Filter's testi-

mony, the evidence was more than sufficient for the jury to conclude beyond a reasonable doubt that Albrecht murdered his wife Cynthia.

## Conclusion

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.