**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

May 09 2013, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**DONALD E.C. LEICHT**
Kokomo, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MICHAEL GENE WORDEN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| BRADLEY RYAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 34A02-1211-CR-921 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HOWARD SUPERIOR COURT
The Honorable George A. Hopkins, Judge
Cause No. 34D04-1108-MR-141

**May 9, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Bradley Ryan appeals his conviction for Murder[1] and Robbery,[2] a class A felony because it resulted in serious bodily injury. Ryan presents the following restated issues for review:

1.      Did the trial court admit improper hearsay evidence?

2.      Was Ryan's right to due process violated when the State lost an item of evidence?

3.      Was the evidence sufficient to support the convictions?

We affirm.

The facts favorable to the convictions are that Ryan and Lonnie Lewis, the 85-year-old victim, were neighbors who lived directly across the street from one another. Several days before August 13, 2011, Ryan was talking to his friend, Brandon Graham. Both Ryan and Graham needed money at the time. Ryan told Graham that Lewis had given him a check for $1500 and that he had a plan to get another check from Lewis. Ryan proposed to "hit him over the side of the head with something, put him in the bathtub, make it seem like he slipped." *Transcript* at 834. They would then get one of Lewis's checks, make it payable to Graham for $9000, and write "Texas Hold 'em debt" on the notation line. *Id*. at 835. Graham told Ryan he did not want to participate.

On Friday, April 12, 2011, Ryan told his girlfriend, Tiffany Kubica, that he had helped Lewis and that Lewis was giving him a check as a loan "to help [Ryan] get on top of the bills" and agreed to let Ryan repay the loan with monthly payments. *Id*. at 627. The next

[1]   Ind. Code Ann. § 35-42-1-1 (West, Westlaw current with all 2012 legislation).
[2]   I.C. § 35-42-5-1 (West, Westlaw current with all 2012 legislation).

2

day, Saturday, April 13, Ryan and Kubica, along with Ryan's 9- or 10-year-old son, spent the day together at Kubica's. That evening, Ryan told Kubica he needed to go home because he was going to play poker with Graham. She dropped him off at his house and left. Later that evening, Ryan contacted Kubica and told her that he was ready for her to pick him up. She picked him up between 9:30 p.m. and 9:40 p.m.. The two stayed at Kubica's house on Saturday night and Kubica drove Ryan home the next morning. Kubica did not hear from Ryan all day Sunday, which was unusual, so she called him Sunday evening and asked why he had not called or texted her. Ryan explained he had a lot of things on his mind, that "a lot of stuff has happened today" and that she should "just come over." *Id*. at 628.

After she arrived, the two were sitting on Ryan's front porch. Ryan told Kubica that he was "concerned" about Lewis because Lewis's blinds were closed and he customarily kept them open. *Id*. at 629. He noted that Lewis's house was dark, "and it's never dark." *Id*. He told Kubica he thought Lewis was losing his mind because he had been leaving keys in doors, leaving doors open, "and just acting out of character." *Id*. Ryan also expressed concern because no one had seen Lewis that day. Kubica suggested that Ryan walk over and check on Lewis. Ryan declined, explaining that he did not "want to get accused of anything." *Id*. at 630. At 1 a.m., by now Monday, April 15, Kubica went home and went to bed. She was awakened at 3:30 a.m. when Ryan knocked on her window. She got up and let him in the house. When he entered the house, "he was freaking out." *Id*. at 631. She asked what was wrong and he replied, "[O]h my god, Lonnie's dead, Lonnie's dead, Lonnie's dead." *Id*. Ryan told Kubica that he put on a pair of gloves and entered into Lewis's house

3

to check on him and found him lying in a pool of blood. Ryan claimed that he checked and found no pulse, and that Lewis's body was stiff and "it stunk." *Id*. at 632. Kubica asked Ryan why he wore gloves and he responded that "he didn't want to be accused of anything." *Id*. Kubica's father and brother-in-law walked in at that point and asked what Ryan and Kubica were talking about. Ryan repeated his story to them and Kubica's father told him he should call 911. Ryan responded that Lewis was already dead, but Kubica's father told him he should still call 911. Ryan did not do so.

Ryan rode with Kubica when she took a friend to work in Lafayette. Along the way, Ryan threw items from the glove box out of the car's window. Kubica could tell that Ryan was under the influence of something, because he "appeared to be messed up." *Id*. at 633. Eventually, Kubica dropped off her friend and she and Ryan returned to her house, where he slept until 2:30 p.m. When he was awakened by the alarm, Ryan became anxious that it was so late and told Kubica he needed to go to the bank, where he was going to cash Lewis's check. Kubica stayed in the car while Ryan went inside. He returned to the car a few moments later, irritated that the bank had informed him that it had to hold the check for three days because it was a third-party check and that he could withdraw only $100.

Meanwhile, Paul and Mary Epperson, who lived across the street from Lewis and next-door to Ryan, noticed on Saturday evening that Lewis's outdoor lights were uncharacteristically off. They became more concerned the next day when Lewis's car remained in the driveway and he did not go to church. Finally, the next morning, Monday, April 15, Paul called Lewis's daughter, Louise Langely, and relayed his concern. She sent

4

her husband, Dan, to check on Lewis. It was Dan who discovered Lewis's body inside his house. Ryan's father soon learned of Lewis's death.

After Ryan arrived back at Kubica's car following his unsuccessful attempt to cash the check, his father called and told him that he needed to come home immediately because something bad had happened to Lewis. According to Kubica, at that point Ryan "suddenly flipped out and it was like it was all a daze. He had no idea what happened to Lonnie because he said I can't believe something's happened to Lonnie." *Id*. at 638. According to Kubica, when they arrived at Ryan's house, there were numerous emergency and law enforcement officials on the scene. Kubica was confused by Ryan's behavior upon arrival. He "was just acting like everything was a big surprise. He had no idea anything had happened, it was all just a big surprise." *Id*. at 638-39.

When Deputy Gary Cook of the Howard County Sheriff's Department arrived on the scene, he was met almost immediately by Ryan. Ryan informed him that "Lonnie was dead." *Id*. at 418. While on the scene during the course of his initial investigation, Deputy Howard frequently returned to his car. According to Deputy Howard, "[e]very time I went back to my vehicle, I was confronted by [Ryan] with different questions" about the investigation. *Id*. Ryan also related to Deputy Howard stories about several of the neighbors. The deputy believed those stories were intended to lead him to conclude that the subject of those stories had something to do with Lewis's death. Deputy Howard also noted that Ryan became "more and more nervous" as time passed. *Id*. at 419. While at the scene, Ryan told several neighbors that Lewis had written him a check for $1500.

5

On August 25, 2011, Ryan was charged with robbing and murdering Lewis. He was found guilty as charged following a jury trial. He was sentenced to sixty years for the murder conviction and thirty years for the robbery conviction. Those two sentences were ordered to be served consecutively for a total executed sentence of ninety years. Further facts will be provided where relevant.

1.

Ryan contends the trial court erred in admitting into evidence portions of statements made to police by Kubica. He contends those statements, which were offered for impeachment purposes, constituted inadmissible hearsay.

Indiana Appellate Rule 46 (8) provides that an appellate argument must meet the following requirements:

> (a) The argument must contain the contentions of the appellant on the issues presented, supported by cogent reasoning. Each contention must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on, in accordance with Rule 22.

> (b) The argument must include for each issue a concise statement of the applicable standard of review; this statement may appear in the discussion of each issue or under a separate heading placed before the discussion of the issues. In addition, the argument must include a brief statement of the procedural and substantive facts necessary for consideration of the issues presented on appeal, including a statement of how the issues relevant to the appeal were raised and resolved by any Administrative Agency or trial court.

So far as we are able to discern, Ryan's entire "argument" on this point is as follows: "Further, the State's offers of her statements were improperly admitted over objections to hearsay, properly made (Trans. Vol. III, pp. 605-06, 699-700, 705, 708, 710-11; Trans. Vol. V. p. 1059-60). Indiana Rules of Evidence 801 (d); K.F. v. State, 961 N.E.2d 501 (Ind. Ct.

6

App. 2012)[, *trans. denied*] ." *Appellant's Brief* at 8, footnote. This amounts to little more than bare assertion, with no supporting argument at all. The issue is waived. *Galvan v. State*, 877 N.E.2d 213 (Ind. Ct. App. 2007).

2.

At some point prior to trial, the State confiscated Ryan's cell phone. Ryan contends his right to due process was violated when the State later lost his phone.

The defendant in a criminal case has the right to examine physical evidence in the hands of the State. *Terry v. State,* 857 N.E.2d 396 (Ind. Ct. App. 2006), *trans. denied*. The failure of the State to preserve such evidence may present grounds for reversal based on denial of due process of law. *Id.* To determine whether a defendant's due process rights were violated, we first decide whether the evidence in question was "'potentially useful evidence'" or "'materially exculpatory evidence.'" *Roberson v. State*, 766 N.E.2d 1185, 1187 (Ind. Ct. App. 2002) (quoting *Samek v. State,* 688 N.E.2d 1286, 1288 (Ind. Ct. App. 1997), *trans. denied)*, *trans. denied*. The United States Supreme Court has described potentially useful evidence as "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood,* 488 U.S. 51, 57 (1988). If the evidence was only potentially useful, in order to establish a due process violation the defendant must establish that the State acted in bad faith. *Albrecht v. State,* 737 N.E.2d 719 (Ind. 2000). On the other hand, exculpatory evidence, as the term suggests, is evidence of an exculpatory nature. The State's duty to preserve exculpatory evidence is:

"'limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'"

*Id.* at 724 (quoting *Holder v. State,* 571 N.E.2d 1250, 1255 (Ind. 1991)).

Ryan contends his cell phone constituted exculpatory evidence because it would "verify and confirm[] the testimony of Tiffany Kubica regarding [Ryan's] location, movement, and time on Saturday, August 13, 2011." *Appellant's Brief* at 10. Ryan's defense consisted primarily of the claim that the chronology of his activities on the evening in question rendered it impossible that he was responsible for Lewis's slaying. A review of the relevant evidence reveals that on August 13, 2011, Lewis left the Kokomo Fraternal Order of Eagles shortly after the band playing there took a break. The band generally took its break at 9:00 p.m. Witnesses estimated that, assuming the band did indeed take its break at 9:00, Lewis left between 9:00 and 9:10 p.m. Testimony revealed that, accounting for two minutes' worth of delays at stoplights and driving slower (perhaps much slower) than the posted speed limit, his drive home would have taken between eight and nine minutes.[3] Phone records reveal that a text message was sent from Ryan's phone to Kubica's phone at about 9:20 p.m. asking her to come to his house and pick him up. When Kubica did not respond to that text, Ryan immediately called Kubica's sister's phone and asked for Kubica. He asked her to pick him up and she left almost immediately to do so. Kubica arrived at his

_____

[3] This testimony was provided by Captain Greg Hargrove, who investigated Lewis's murder. Captain Hargrove timed himself while driving this route and testified that he sometimes drove 20 m.p.h. when the posted speed limit was 40 m.p.h.

house between 9:30 and 9:40 p.m.

Detectives investigating at the scene of the murder noticed that the main breaker had been thrown so that the power was off in Lewis's house. Kubica later recalled that outdoor lights that customarily were on after dark at Lewis's residence were not on when she picked up Ryan on the evening of August 13. Lewis's body was found between a bedroom and a bathroom in his home. He had received three severe blows to the head, one to the forehead and two to the back of his head. These blows, any one of which could have caused death, resulted in massive skull fractures. In fact, the coroner testified that based not only on the nature of the wounds themselves, but also the way Lewis fell, death was almost immediate:

> The thing that really got my attention was the way he was laying. He was laying in the prone position, which is face down, and his right leg was kind of under his body and both of his hands were under his body around his chest area. We call it distorted, it's an unusual lay. Usually when we see something like that, that means death was almost instant.

*Transcript* at 406. There was evidence that Lewis often left his doors unlocked; there was also evidence that Ryan had access to a key to Lewis's house.

The State introduced Kubica's phone records into evidence. Contrary to Ryan's assertions on appeal, these records more or less corroborated other evidence with respect to the timing of Ryan's texts and phone calls. The critical hour with respect to the chronology of events culminating in Lewis's murder was between 9:00 p.m. and 10:00 p.m. on Saturday. Lewis was last seen alive at the Eagles at about 9:00 p.m. The defense established that Ryan contacted Kubica at about 9:20 p.m. and she picked him up between 9:30 and 9:40 p.m. Ryan contends that the evidence demonstrates that Lewis was still alive at this time and

9

therefore that Ryan could not have been the killer. This is simply not true. Lewis plausibly could have been home by 9:10. The physical evidence permits a reasonable inference that Lewis could have been slain by the killer's first blow, and that inflicting all three blows could have been delivered in just a few seconds. Mindful that Ryan lived literally right across the street from Lewis, even the timeline that Ryan advocates does not exclude the possibility that he killed Lewis. Therefore, Ryan's cell phone did not possess the exculpatory value that Ryan urges. At most, it would merely have been potentially useful evidence. *See Albrecht v. State,* 737 N.E.2d 719. As such, Ryan would have to prove the State acted in bad faith in misplacing the phone in order to establish a due process violation and gain reversal. *Id.* Yet, he has not even alleged that the State acted in bad faith in misplacing the phone, and the record does not reflect that he could do so successfully. Therefore, Ryan is not entitled to reversal on this issue.

3.

Ryan contends the evidence is insufficient to prove he killed Lewis. Our standard of reviewing challenges to the sufficiency of the evidence supporting a criminal conviction is well settled.

> When reviewing a challenge to the sufficiency of the evidence underlying a criminal conviction, we neither reweigh the evidence nor assess the credibility of witnesses. The evidence—even if conflicting—and all reasonable inferences drawn from it are viewed in a light most favorable to the conviction. "[W]e affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Davis v. State,* 813 N.E.2d 1176, 1178 (Ind. 2004). A conviction can be sustained on only the uncorroborated testimony of a single witness, even when that witness is the victim.

10

*Bailey v. State*, 979 N.E.2d 133, 135 (Ind. 2012) (some citations omitted). We note that the evidence of Ryan's guilt with respect to the murder charge was entirely circumstantial. Our Supreme Court has stated, "[a] conviction for Murder may be based purely on circumstantial evidence." *Moore v. State,* 652 N.E.2d 53, 55 (Ind. 1995). When reviewing a murder conviction based upon circumstantial evidence, "we will not disturb a verdict if the jury could reasonably infer that the defendant is guilty beyond a reasonable doubt from the circumstantial evidence presented." *Id.* Moreover, we are mindful that the circumstantial evidence "need not overcome every reasonable hypothesis of innocence. It is enough if an inference reasonably tending to support the verdict can be drawn from the circumstantial evidence." *Id.; see also Kriner v. State,* 699 N.E.2d 659, 664 (Ind. 1998) ("[c]ircumstantial evidence by its nature is a web of facts in which no single strand may be dispositive").

Ryan argues that the evidence did not establish that he was the person who killed Lewis. As indicated above, the contention is based in part upon the assertion that the evidence related to the timeline of events demonstrated he could not have been present when Lewis was murdered. We have thoroughly set out the evidence relative to the timeline of significant events concerning Ryan's whereabouts and Lewis's death. We reiterate our earlier conclusion that the timeline evidence does not preclude Ryan as the perpetrator.

The State presented evidence sufficient to establish a motive – robbery – and to create a reasonable inference that Ryan planned the murder in advance and shared at least the rudiments of his plan with someone else. As it turned out, Lewis was killed in his home by a blow to the head, which was the way Ryan proposed to Graham that they would kill Lewis

11

when the two spoke the day before Lewis's murder. Ryan told Kubica on Saturday evening that he was going home to play poker with Graham. Graham later testified that he did not know how to play card games. Ryan lived directly across the street from Lewis and had access to a key to Lewis's house. The electrical power to Lewis's home was turned off shortly before the murder by someone who had gained entry to the home. Finally, Ryan's curious behavior, as detailed above, with respect to (1) the question of Lewis's whereabouts and welfare on Saturday evening and Sunday; (2) the $1500 check supposedly given to him by Lewis; (3) purportedly discovering Lewis's body but failing to report it; (4) receiving the news from his father that Lewis had been murdered; and (5) the on-scene investigation the day Lewis's body was discovered, is at least suggestive of guilt.

Perhaps no one fact or circumstance presented by the State would have been sufficient to support a reasonable inference that Ryan killed Lewis. Viewed as a whole, however, the "web of facts" established by the evidence created an inference of guilt that reasonably tends to support the verdict that Ryan killed Lewis. *Kriner v. State,* 699 N.E.2d at 664.

Ryan also contends the evidence does not support his conviction for robbery in that "[t]he State simply presented no evidence on all the elements of Count II that the Trial Court instructed the jury had to be proven beyond a reasonable doubt." *Appellant's Brief* at 6. Although this seems to connote a challenge to the State's proof with respect to each and every element of the offense of robbery, Ryan's subsequent analysis focuses solely upon the connection between Lewis's murder and the $1500 check Ryan claimed that Lewis gave to him. Specifically, Ryan contends there is no evidence that he used force or threatened to use

12

force in procuring the check "he received … from Lewis on Friday (August 12, 2011) and there is no evidence of any serious bodily injury being endured by Lewis between Friday, August 12, 2011 and Saturday evening, August 13, 2011 when he returned home from the Eagles." *Id*. at 5-6. Ryan's argument assumes as a fact that he was in possession of the $1500 check on Friday, April 12.

There was evidence that Ryan did indeed tell several people on the weekend of Lewis's murder that he already had received or was about to receive a check from Lewis. He told Kubica on Friday that he was going to receive a check and that he could use the money to help pay her cell phone bill. Kubica could not recall the first time she actually saw the check itself. She testified that she might have seen it Saturday afternoon, but she was not sure. When Kubica did see the check, "it was a quick flash. I could see the writing was in blue and it was shaky, that's all I could tell." *Transcript* at 696.

Ryan told Kubica that Lewis filled out the check on Ryan's back. Courtney King was a forensic document examiner for the Indiana State Police Laboratory Division. She performed an analysis of the handwriting on the front and back of the check. The results of her analysis are as follows:

> The writing on the front of the check in Item 900 contains heavy pen pressure, hesitation marks, pen lifts, poor line quality, blunt beginning and ending strokes, and lacks speed of execution. These features indicate unnatural writing which could be attributed to disguise, distortion, simulation, or some other unknown factor affecting the writer or writing process.
>
> In addition to the features listed above, the "Lonnie Lewis" signature on the front of the check in Item 900 contains pictorial similarities to the known writing of Lonnie Lewis …, but is defective in execution. This may indicate that this signature is an attempt to simulate a genuine signature of Lonnie

13

Lewis.

> When writing is unnatural or simulated, the true handwriting characteristics of the writer are not displayed[,] which is a limitation to the handwriting examination. Therefore, Lonnie Lewis could not be identified to nor eliminated from being the writer of the "Lonnie Lewis" signature on the front of the check in Item 900.
>
> Lonnie Lewis was probably not the writer of the handwriting and hand printing on the front of the check in Item 900, excluding the "Lonnie Lewis" signature on the front of the check.
>
> Lonnie Lewis could not be identified to nor eliminated from being the writer of the "Brad Ryan" signature on the reverse of the check in Item 900.
>
> Bradley Ryan …, could not be identified to nor eliminated from being the writer of the handwriting, hand printing, or "Lonnie Lewis" signature on the front of the check in Item 900.
>
> It is probable that Bradley Ryan was the writer of the "Brad Ryan" signature on the reverse of the check in Item 900.

*Volume of Exhibits* at 11. King testified that, except for the signature, the writing on the front of the check was written with "very heavy pen pressure." *Transcript* at 782. She was asked whether the check could have been filled out in the manner that Ryan described to Kubica, i.e., using his back as a writing surface. She replied, "I would expect to see tears or punctures in the check with, given that heavy pen pressure, if it was not written on a hard surface." *Id*. at 783. The check exhibited no such damage. Finally, when Ryan awakened Monday at 2:30 p.m., he was angry with Kubica for letting him sleep that late. He demanded that she drive him to a bank immediately so he could cash the check.

From the foregoing evidence, the jury could reasonably have inferred that Lewis did not write the check to Ryan and that Ryan took the check from Lewis's house at or very near

14

the time he killed Lewis.  Viewed as such, the same evidence created an inference of guilt that reasonably tends to support the verdict that Ryan robbed Lewis, as charged.

Judgment affirmed.

ROBB, C.J., and CRONE, J., concur.